UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INFORMED CONSENT ACTION NETWORK,<br><br>      Plaintiff,<br><br>      v.<br><br>CENTERS FOR DISEASE CONTROL AND PREVENTION, et al.,<br><br>      Defendants. | Civil Action No. 23-0747 (TSC) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure ("Rule") 56(c), Defendants the Centers for Disease Control and Prevention ("CDC") and the Department of Health and Human Services ("Defendants"), by and through undersigned counsel, move for summary judgment in response to the Complaint filed by Plaintiff Informed Consent Action Network ("Plaintiff").

## INTRODUCTION AND SUMMARY

Plaintiff commenced this Freedom of Information Act ("FOIA") action seeking records related to Proportional Reporting Ratio analyses performed to identify adverse events that are disproportionately reported relative to other adverse events pursuant to the Vaccine Adverse Events Reporting System ("VAERS") Standard Operating Procedures for COVID-19. *See* ECF No. 1-1 at 7. After much engagement, the parties were able to collaborate on a supplemental search and were able to narrow their differences regarding Defendants' withholdings so much so that the only issue left is records Defendants have withheld under Exemption 5. The records (consisting of emails and Excel documents) are predecisional and deliberative scientists' and statisticians' peer-to-peer discussions, which if released would cause them to operate in a fishbowl

regarding very sensitive issues pertaining to a public health emergency. Moreover, release of these records would cause foreseeable harm and Defendants' declaration and *Vaughn* suffice to demonstrate that Defendants have satisfied their segregability obligations. Accordingly, summary judgment for the Defendants is warranted.

## BACKGROUND

Plaintiff commenced this FOIA action "to obtain copies of the [Proportional Reporting Ratio] analysis performed by the CDC as provided in its VAERS Standard Operating Procedure for COVID-19." Compl. at 3, ECF No. 1. Specifically, Plaintiff submitted a FOIA request for "[a]ll records related to Proportional Reporting Ratio analyses performed to identify [adverse events] that are disproportionately reported relative to other [Adverse Events] pursuant to Sections 2.0, 2.3., and 2.3.1 of the VAERS Standard Operating Procedures for COVID-19. This should include, but not be limited to, all communications concerning [Proportional Reporting Ratio] analyses including communications concerning any decision to not conduct [Proportional Reporting Ratio] analyses." FOIA Request at 7, ECF No. 1-1 (internal quotation marks omitted); *see also* Ex. A hereto, Declaration of Roger Andoh at 2 ("Andoh Decl."). According to Plaintiff, "[i]nformation helpful to fulfilling the request: The CDC's Immunization Safety Office is the likely custodian of responsive records." *Id*. VAERS is a passive reporting system to which medical professionals, pharmaceutical companies and others can report an adverse event occurring after administration of a vaccine, and Proportional Reporting Ratio measures how common an adverse event for a particular vaccine is compared to how common the event is in the overall VAERS database.[1]

---

[1]  VAERS is co-sponsored and operated by the CDC and another federal health agency.

During the pendency of this litigation, parties conferred and cooperated on a supplemental electronic search, with Plaintiff suggesting three additional custodians and search terms. Ex. A, Andoh Decl. at 5. The supplemental search resulted in 25 pages of records, only seven of which had not been returned by Defendants' initial search. *Id*. Defendants also conducted a manual search that resulted in the release of 341 pages of records and seven Excel spreadsheets. *Id*. In total, Defendants produced 366 pages of records fifty-eight Excel spreadsheets. The parties also conferred and cooperated to narrow their differences regarding Defendants' withholdings such that Plaintiff now is only challenging a narrow subset of Defendants' Exemption 5 withholdings.

Here, Exemption 5 "was applied to protect pre-decisional, deliberative communications among agency staff regarding analysis and planning how to run and what should be included in the [Proportional Reporting Ratio] tables." *Id*. at 5. Specifically, Exemption 5 was applied to portions of twenty-one emails and to five excel tables. As explained herein, these withholdings were proper.

## LEGAL STANDARDS

### I. Rule 56 Motions for Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 322-23. A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. When determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable

inferences drawn therefrom, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S., 574, 587-88 (1986).

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the require is that there be no *genuine* issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). The moving party may discharge this burden by "'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the non-moving party's case." *Sweats Fashion, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (emphasis omitted; quoting *Celotex Corp.*, 477 U.S. at 332). Once the moving party has met its burden, the non-moving party may not rest upon mere allegations or denials of its pleadings and must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. Summary judgment is thus due if the non-moving party fails to offer "evidence on which the jury could reasonably find" for the non-movant. *Id.*

## II. Summary Judgment Standard in FOIA Cases

Summary judgment is the typical vehicle for resolution of a FOIA action. *McLaughlin v. Dep't of Just.*, 530 F. Supp. 2d 210, 212 (D.D.C. 2008); s*ee also Brayton v. Off. of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). To obtain summary judgment in a FOIA action, an agency must show, viewing the facts in a light most favorable to the requester, that there is no genuine issue of material fact as to the agency's compliance with FOIA. *Steinberg v. Dep't of Just.*, 23 F.3d 548, 551 (D.C. Cir. 1994). The agency "bears the burden of proving the applicability of claimed exemptions." *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). The burden may be satisfied by declarations or indices detailing the reasons that a FOIA exemption applies and describing the materials withheld. *See e.g.*, *id.*; *Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973). "If an agency's affidavit describes the justifications for withholding the information

with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU*, 628 F.3d at 619; *accord Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013); *see also Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011) ("[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))).

The Court may enter summary judgment based solely upon information provided in affidavits or declarations when those affidavits or declarations describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exception, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). A plaintiff "cannot rebut the good faith presumption" afforded to an agency's supporting affidavits "through purely speculative claims about the existence and discoverability of other documents." *Brown v. Dep't of Just.*, 742 F. Supp. 2d 126, 129 (D.D.C. 2010).

## ARGUMENT

Generally, Defendants withheld records reflecting "preliminary findings of the [Proportional Reporting Ratio] statistical analysis and reflect the deliberative process agency subject matter experts used to finalize the specific items to be included within the tables that were most relevant and beneficial for use by relevant people at the agency." Ex. A, Andoh Decl. at 7. Because the emails and Excel records fit squarely within the legal parameters of the deliberative process privilege, Defendants are entitled to summary judgment as further set forth below.

Exemption 5 protects disclosure of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

5 U.S.C. § 552(b)(5). Courts have "construed this exemption to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context," *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981), including three executive privileges relevant here: attorney work product, attorney-client and deliberative process. *See Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149-50, 155 (1975) (discussing attorney-client and deliberative process privileges); *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 252-55 (D.C. Cir. 1977) (discussing attorney-client privilege). For a document to qualify for Exemption 5, "its source must be a government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Nat'l Inst. of Mil. Just. v. Dep't of Def.*, 512 F.3d 677, 680, n.4 (D.C. Cir. 2008) (noting that records withheld under Exemption 5 must be inter- or intra-agency records "'unavailable by law' under one of the established civil discovery privileges").

The deliberative process privilege protects "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citation omitted). This privilege rests "on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front-page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Klamath Water*, 532 U.S. at 8-9. There are three policy bases for the privilege, which protects: (1) creative debate and candid consideration of alternatives within an agency, thereby improving the quality of agency policy decisions; (2) the public from misconstruing the views of an individual as the views of the agency;

and (3) the integrity of the decision-making process. *See Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048-49 (D.C. Cir. 1982).

Exemption 5 "is intended to protect the deliberative process of government and not just deliberative material." *Mead Data*, 566 F.2d at 256. For the deliberative process privilege to apply under Exemption 5, courts must deem the material both pre-decisional and deliberative. *Wolfe v. Dep't of Health & Hum. Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc). A document is pre-decisional if it was "prepared in order to assist an agency decision maker in arriving at his decision, rather than to support a decision already made." *Petrol. Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal quotations omitted). A document is deliberative in nature if it "reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

The "ultimate aim" of the deliberative process privilege set forth in Exemption 5 is to "prevent injury to the quality of agency decisions." *Petrol. Info.*, 976 F.2d at 1433-34 (internal quotations omitted). When evaluating deliberative process claims, courts "must give considerable deference to the agency's explanation of its decisional process." *Pfeiffer v. CIA*, 721 F. Supp. 337, 340 (D.D.C. 1989) (citation omitted).

Here, Defendants properly withheld records—consisting of emails, attachments, and Excel tables reflecting preliminary opinions and thoughts concerning analyses of VAERS and Proportional Reporting Ratio data generated and related to COVID 19. *See generally* Ex. A., Andoh Decl.; *see also* Ex. B, *Vaughn* index. The emails, attachments and tables are specific to certain specific dates and topics. *Id*. First, the communications are pre-decisional because they contain the internal deliberations between Agency employees before a final decision was made about the specific matters addressed in each communication. *See* Ex. A, Andoh Decl. ¶¶ 26-35;

*see also Vaughn* Index (explaining the pre-decisional nature of each document). Specifically, "[t]hese preliminary findings are the result of an ongoing process of revisions and consultations and represent the exchange of ideas and viewpoints among subject-matter experts whose expertise and judgment are believed to be relevant." *See id*. ¶ 26. Second, the communications are deliberative because they reflect back-and-forth discussions between Agency employees who were considering the specific matters addressed in each communication. *See* Andoh Decl. ¶ 26 ("The discussions pertain to the preliminary findings of the [Proportional Reporting Ratio] statistical analysis and reflect the deliberative process agency subject-matter experts used to finalize the specific items to be included within the tables that were most relevant and beneficial for use by relevant people at the agency."); *see also* Ex. B, *Vaughn* Index (explaining the deliberative nature of each document).

Further, many of the withheld communications consist of drafts of material. *See, e.g.*, Ex. A, Andoh Decl. ¶ 63. ("Release of this information would reveal the internal deliberations and preliminary thoughts of CDC staff on matters pertaining to the draft statistical analyses of proportional reporting ratios."). Drafts are typically pre-decisional and deliberative. *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) (emphasis added); *see also Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982) (rejecting argument that "any document identified as a 'draft' is per se exempt").[2] As the D.C. Circuit explained, drafts generally fall within Exemption 5 because the "disclosure of editorial judgments—for example, decisions to insert or

---

[2] The D.C. Circuit explained that the relevant decision for purposes of analyzing the deliberative process privilege is the decision to publish, not the decision to draft. *See Formaldehyde Inst. v. Dep't of Health & Hum. Servs.*, 889 F.2d 1118, 1120 (D.C. Cir. 1989); *see also Russell*, 682 F.2d at 1049 (recognizing that Exemption 5 applies to an agency's editorial review process). In this case, the drafts predated decisions to publish. *See generally* Ex. A, Andoh Decl.

delete material or to change a draft's focus or emphasis—would stifle the creative thinking and candid exchange of ideas necessary" to produce the final work. *Dudman Comm'cns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987). Drafts are prepared "prior in time to the final decision on agency policy," *ICM Registry, LLC v. Dep't of Com.*, 538 F. Supp. 2d 130, 132 (D.D.C. 2008), and reflect the give-and-take process rather than an adopted policy itself. *See Coastal States*, 617 F.2d at 866.

For example, Emails 4 (pages 24-59), 20 (pages 271-304), and 21 (pages 305-340) relate discussions between April 8 and April 20, 2022, "consist of pre-decisional, deliberative discussions among CDC subject-matter experts concerning preliminary statistical analysis and the process by which agency subject-matter experts may generate and compare their analytical findings prior to publication." Ex. A, Andoh Decl. ¶ 35. "These preliminary tables include various iterations of table layout (e.g., column order, field sorting), how certain items were displayed, how often tables were to be run, and how the multiple tables were organized when compiled. The final versions of these tables were previously released to [Plaintiff] and Epoch Times through a" FOIA response. *Id*. ¶ 36. Likewise, the withholding of the Excel preliminary tables falls in the same category in that they were preliminary and predecisional deliberations amongst subject matter experts prior to the final decision that was published and released to a media outlet. *See id*. ¶¶ 79-83.

"[S]o long as agency decisionmakers remain 'free to change their minds,' and so long as they have yet to issue a decision or to announce a policy, documents prepared to communicate candid advice within the agency are predecisional." *Juul Labs, Inc. v. FDA*, Civ. A. No. 22-2853 (RDM), 2024 U.S. Dist. LEXIS 73567, at *32 (D.D.C. Apr. 23, 2024) (upholding application of the deliberative process privilege to records "contain[ing] the thinking of [] scientists developed

during review of Plaintiff's [marketing], for the purpose of helping the agency make its decision on whether to authorize marketing of Plaintiff's products."); *see also Formaldehyde Inst.*, 889 F.2d at 1120 (holding that peer reviews sent by agency scientists regarding a possible publication were "predecisional because [they] preceded the agency's decision whether and in what form to publish" the article, and it was deliberative because "the agency secured review commentary in order to make that decision," and the records thus were protected by Exemption 5); *Hooker v. Dep't of Health & Hum. Serv.*, 887 F. Supp. 2d 40, 57-58 (D.D.C. 2012) (concluding that peer review comments, draft manuscripts, and communications discussing draft manuscripts fell within the scope of Exemption 5). The Exemption 5 withholdings here fall squarely within these parameters.

Moreover, Defendants properly invoke the deliberative process privilege here not only to protect predecisional information but also to protect their decision-making processes—a plainly permissible use of the privilege. "The release of this information would compromise the deliberative process of the agency requiring open, frank discussions on decision-making among subject-matter experts concerning [Proportional Reporting Ratio] statistical approaches." Ex. A, Andoh Decl. ¶ 27. "The result would be a chilling effect on intra- and interagency communications and reduce the ability of agency officials to deliberate in a meaningful manner during a public health emergency." *Id*. The privilege "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options," as well as an "understanding that employees would be chilled from such rigorous deliberation if they feared it might become public." *Jud. Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017); *Sears*, 421 U.S. at 150 ("[H]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances[.]" (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974))). The privilege also

avoids confusion from disclosure of ideas that are not and may never become final policy and prevents misimpressions from "dissemination of documents suggesting reasons and rationales" that are not ultimately relied on. *Coastal States*, 617 F.2d at 866.

Here, regarding Email 5 (pages 64-65) for example, which encompasses scientists' discussions on May 13, 2021, concerning Proportional Reporting Ratio for myocarditis, "[r]elease would cause harm by providing the public with incomplete, preliminary, or confusing information on a sensitive matter that this deliberative process is designed to avoid." Ex. A, Andoh Decl. ¶ 44. "These negative outcomes would result in a chilling effect on intra- and inter-agency communications on matters regarding the use of CDC statistical analysis techniques and reduce the ability of agency officials to deliberate in a meaningful manner during an ongoing public health emergency." *Id*. In *Juul Labs*, the Court invoked this rationale in concluding that "disclosing the internal agency materials, which agency officials are relying on now to inform their review [], will distort and hinder their review forcing the agency 'to operate in a fishbowl.'" *Juul Labs*, 2024 U.S. Dist. LEXIS 73567, at *66 (quoting *EPA v. Mink*, 410 U.S. 73, 87 (1973)). The *Juul Labs* court's concern that the records sought implicated an ongoing review is also present here, given that the records sought arose during a then-ongoing public health emergency. *See* Ex. A, Andoh Decl. ¶ 27 ("The result would be a chilling effect on intra- and interagency communications and reduce the ability of agency officials to deliberate in a meaningful manner during a public health emergency.").

Further, FOIA prevents an agency from withholding requested records unless it "reasonably foresees that disclosure would harm an interest protected by" the relevant exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I). In *Machado Amadis v. Department of State*, 971 F.3d 364 (D.C. Cir. 2020), and *Reporters Committee for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir.

2021), the D.C. Circuit explained how FOIA's foreseeable-harm requirement applies to records protected by the deliberative-process privilege. In *Machado Amadis*, the D.C. Circuit explained that the agency must consider the specific "information at issue" in the case and show that disclosure of the requested information "would" chill future internal agency deliberations, not simply that it "could" do so. 971 F.3d at 371.

As one of several examples, the Andoh Declaration demonstrates that disclosure of public health emergency information would "result[] confusion and misunderstanding [that] would lead to loss of trust and credibility in CDC's initiatives, and its ability to protect and promote the health of the nation." Ex. A, Andoh Decl. ¶¶ 27-33. For example, regarding Email 9 (page 154-157), between CDC Vaccine Safety subject matter experts, the redactions pertain to communications about whether the CDC was monitoring signals for pulmonary embolisms. *See id*. ¶¶ 52-58. "Release would also cause harm by providing the public with incomplete, preliminary, or confusing information on a sensitive matter that this deliberative process is designed to avoid." *Id*. ¶ 57. "These negative outcomes would result in a chilling effect on intra- and inter-agency communications on matters regarding the use of CDC statistical analysis techniques and reduce the ability of agency officials to deliberate in a meaningful manner during an ongoing public health emergency." *Id*. Further, the resulting confusion and misunderstanding would lead to a loss of trust and credibility in CDC's initiatives, and its ability to protect and promote the health of the nation. *Id*. The same is true of Emails 10, 11, and 12, between CDC Vaccine Safety subject matter experts and a Senior Health Communications Specialist concerning deliberations about how to respond to a reporter's inquiry. *See id*. at ¶¶ 59-64 (same foreseeable harm considerations).

Finally, "[f]or each document that was withheld or redacted, a line-by-line review was completed to determine whether any portions of the documents could be released [and] CDC has

released all non-exempt material, unless the material is inextricably intertwined with exempt material." Ex. A, Andoh Decl. ¶ 82. "For each document that was withheld in its entirety, it was determined that there was no reasonably segregable, non-exempt information in this document, because any non-exempt information would leave only meaningless words and phrases." *Id*. ¶ 83. FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). In evaluating segregability, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshal Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). As Defendants have done here, "[a]ffidavits attesting to the agency's 'line-by-line review of each document withheld in full' and the agency's determination 'that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions,'" in conjunction with a *Vaughn* index describing the withheld record, suffice. *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination"); *see also Emuwa v. Dep't of Homeland Sec.*, 113 F.4th 1009, 1017 (D.C. Cir. 2024) (attestation "that 'no further segregation' was possible without disclosing such [exempt] information" sufficed to establish agency's fulfillment of its segregation duty and to establish foreseeable harm) (citing 5 U.S.C. § 552(a)(8)(A)(ii), and *Leopold v. Dep't of Just.*, 94 F.4th 33, 37-38 (D.C. Cir. 2024)).

\* \* \*

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants summary judgment.

Dated: November 1, 2024
       Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____*Kenneth Adebonojo*_____
    KENNETH ADEBONOJO
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2562